DRUKKER COMMUNICATIONS, INC.,
and its wholly owned subsidiary, The
Daily Advance, Inc., Petitioner

v.

NATIONAL LABOR RELATIONS
BOARD.

No. 81–2139.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 6, 1982.

Decided Feb. 25, 1983.

Henry I. Hamburger for petitioner.

Lawrence Song, Atty., N.L.R.B., Washington, D.C., with whom Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., was on the brief, for respondent. William R. Stewart, Atty., N.L.R.B., Washington, D.C., also entered an appearance for respondent.

Before TAMM, WILKEY and SCALIA, Circuit Judges.

Opinion for the court filed by Circuit Judge SCALIA.

SCALIA, Circuit Judge:

Drukker Communications, with its wholly owned subsidiary, The Daily Advance, Inc., appeals under 29 U.S.C. § 160(f) (1976) the National Labor Relations Board's adverse determination and order in an unfair labor practice action under 29 U.S.C. § 158(a)(1), (5) (1976). The case presents the issue of

the Board's power to withhold relevant testimony of one of its employees, and a number of issues regarding sufficiency of the complaint and factual support for the Board's determination.

The basic facts, which will be supplemented during the course of our discussion, are as follows: On May 3, 1974, Newark Mailers' Union Local 11 demanded that Union Building and Investment Company (UBI), then owner of The Daily Advance, recognize it as the collective bargaining agent for the newspaper's circulation department employees. UBI declined recognition, and the union petitioned for certification by the NLRB. On May 28, representatives of the union and UBI met with George H. Abrams of the NLRB's Regional Director's Office and concluded a consent election agreement. The election was held on June 21, and the tally of unchallenged ballots showed that the union had lost by a 12-to-10 vote. The employer challenged five ballots, alleging that they had been cast by "motor route carriers" who were independent contractors and were outside the stipulated unit. After litigation which reached the Board level, the challenge was ultimately rejected and the ballots were opened and counted, producing a 15-to-12 union victory. The union was certified on September 7, 1976.

Between the time of the election and the certification, UBI changed its name to Drukker Communications, Inc., and sold all assets and liabilities of the newspaper to its wholly owned subsidiary, The Daily Advance, Inc. There is no indication in the record, nor has it been alleged, that the change was prompted by unionization of the company's work force, or was anything other than a bona fide business decision. Either before or after the certification (for certain items the timing is in dispute) The Daily Advance unilaterally made a number of changes in its operations: It moved its mailroom from Dover to Roxbury, New Jersey, some eight miles away. It gradually phased out "motor route carriers" (who delivered papers owned by the newspapers for a fixed stipend) largely in favor of "delivery contract holders" (who bought papers and resold them at a profit, had the right to charge their customers a service fee, and in addition received a fixed stipend to assure profitability). It replaced the employee drivers of company-owned trucks with independent "hauling contract holders"; replaced district advisors with district sales representatives; and reduced a mail clerk from full-time to part-time status.

After certification, the company declined to bargain with the union. On February 14, 1977, the Board issued an unfair labor practice complaint against "Union Building and Investment Company T/A [trading as] The Daily Advance," alleging refusal to recognize and bargain collectively with the union. An amendment to the complaint added the charges of changing terms and conditions of work without prior consultation with the union and bargaining directly with employees. In the proceedings before an administrative law judge (ALJ) the attorney for the companies raised all of the arguments that will be discussed below. The ALJ rejected them; he found that the companies had committed the unfair labor practices charged, and ordered them to cease and desist from such practices and to bargain concerning the unremedied effects of past violations. His opinion amended the name of respondent to read "Drukker Communications, Inc., and its wholly owned subsidiary The Daily Advance, Inc., formerly Union Building Investment Company T/A The Daily Advance." The ALJ's findings, conclusions and order were adopted by the Board with one modification—that the employer need not bargain over the move of the mail room, since the statute of limitations had run on that action. *Drukker Communications, Inc.,* 258 N.L.R.B. 734 (1981).

### SUBPOENA OF BOARD EMPLOYEE

Petitioner argues that the certification was invalid because the motor route carriers, whose challenged ballots tipped the scales in the election, were excluded from the unit by the May 28 stipulation. The basis of this contention is that the phrase

"[a]ll circulation department employees, including drivers," contained in that portion of the stipulation describing the agreed-upon collective bargaining unit, was not intended to cover motor route carriers. Jt. App. at 53. The language bears the Board's reading, and we would not normally disturb the agency's reasonable judgment on a matter of interpretation. The dispute, however, centers about an alleged understanding or oral agreement at the time of the stipulation conference, to the effect that motor route carriers were not meant to be included in the unit.[1] On the basis of the evidence presented (consisting of conflicting testimony by the company's lawyer on the one hand and the union's lawyer on the other) the ALJ's judgment that no oral understanding existed was also well within the bounds of the reasonable. Petitioner asserts, however, that all of the relevant evidence was not considered, because of the ALJ's refusal to permit subpoena of George H. Abrams. Abrams was a Board employee in Region 22. He had been present at the conference which produced the stipulation, and had signed the document itself, as "Board Agent," below a line reading "Recommended:". Jt.App. at 53. Petitioner sought from the General Counsel the permission for Abrams' testimony required by the Board's rules, 29 C.F.R. § 102.118(a)(1) (1981).[2] When permission was refused, petitioner subpoenaed Abrams; the ALJ denied the motion to compel his testimony, and granted the General Counsel's motion to quash the subpoena.

The National Labor Relations Act provides that "[t]he Board, or any member thereof, shall upon application of any party to [its] proceedings, forthwith issue to such party subpenas requiring the attendance and testimony of witnesses ... in such proceedings ...." On application of the subpoenaed party, "the Board shall revoke ... such subpena if in its opinion the evidence whose production is required does not relate to ... any matter in question in such proceedings, or if in its opinion such subpena does not describe with sufficient particularity the evidence whose production is required." 29 U.S.C. § 161(1) (1976). Although the statute explicitly permits the quashing of subpoenas only for irrelevance or lack of particularity, it does not explicitly exclude other grounds, and the availability of other grounds must certainly be implied—for example, to take an extreme instance, unwarranted interference with First Amendment rights. Thus, the Board's delegation to administrative law judges of its subpoena authority properly (if somewhat illiterately) adds to the two grounds set forth in the statutory authority to quash "if for any other reason sufficient in law the subpena is otherwise [sic] invalid." 29 C.F.R. § 102.31(b) (1981). Besides the subpoena section of the Act, two other provisions of law are pertinent. The formal adjudication provision of the Administrative Procedure Act, 5 U.S.C. § 556(d) (1976), which governed this proceeding, see 5 U.S.C. § 554(a) (1976), provides that "[a]

1. A portion of the administrative law judge's decision suggests the adoption of a parol evidence rule that would render the existence of such an oral agreement irrelevant. That portion, however, is prefaced by the phrase "[i]n such circumstances," referring to the immediately preceding discussion which found no "credible basis" for the alleged oral understanding. 258 N.L.R.B. at 742. In light of that discussion, the admission of testimony concerning an oral agreement, and the Board's prior case law, see Banner Bedding, Inc., 214 N.L.R.B. 1013 (1974), we assume that the existence of the understanding would alter the effect of the stipulation, and, sequentially, the outcome of the election and the validity of the certification. See also the discussion at note 4, infra.

2. The rule reads in pertinent part as follows: (a)(1) [N]o regional director, field examiner, administrative law judge, attorney, specially designated agent, general counsel, member of the Board, or other officer or employee of the Board shall ... testify in behalf of any party to any cause pending in any court or before the Board ..., with respect to any information, facts, or other matter coming to his knowledge in his official capacity ..., whether in answer to a subpoena or otherwise, without the written consent of ... the general counsel if the person is in a regional office of the agency ... and subject to the supervision or control of the general counsel.

party is entitled to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts." NLRB unfair labor practice proceedings are also governed by another provision which, if not unique, is at least extraordinary, requiring that they "shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States under the rules of civil procedure . . . ." 29 U.S.C. § 160(b) (1976).

Even in courts of law, relevant evidence sought from government officers is sometimes excluded, and a subpoena for it denied, because of a well founded claim that its production would, in one respect or another, harm the public interest:

> Such, for example, are claims that the information sought would disclose confidential informants (*Mitchell v. Bass,* 252 F.2d 513 [ (8th Cir.1958) ], state secrets (*United States v. Reynolds,* 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 [ (1953) ], military secrets (*United States v. Reynolds,* supra), or mental processes of those engaged in investigative or decisional functions (*United States v. Morgan,* 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 [ (1941) ]; *Appeal of Securities & Exchange Commission,* 226 F.2d 501, 519 [ (6th Cir. 1955) ] ).

*General Engineering, Inc. v. NLRB,* 341 F.2d 367, 375 (9th Cir.1965). This court has applied such a doctrine to district court testimony in a factual context similar to that before us. *See International Ass'n of Machinists & Aerospace Workers v. National Mediation Board,* 425 F.2d 527, 538–41 (D.C.Cir.1970). There is room for the doctrine in administrative proceedings as well; indeed, the public interest may more often require it there than elsewhere. It has been applied in other circuits, specifically to

the proceedings of the Board. *See NLRB v. Joseph Macaluso, Inc.,* 618 F.2d 51 (9th Cir. 1980); *M.S.P. Industries, Inc. v. NLRB,* 568 F.2d 166, 178–79 (10th Cir.1977) (dictum); *Stephens Produce Co. v. NLRB,* 515 F.2d 1373, 1376–78 (8th Cir.1975); *J.H. Rutter Rex Mfg. Co. v. NLRB,* 473 F.2d 223, 232–35 (5th Cir.1973). We believe, moreover, that in appropriate circumstances the doctrine extends to protection of agency concerns of the sort expressed by the General Counsel in his refusal to permit Abrams' testimony, and essentially accepted by the ALJ, namely that "the highly sensitive and delicate role of the Board Agent in processing and resolving unfair labor practice and representation cases would [be] seriously impaired if a real likelihood existed of the Board Agent's becoming enmeshed as a witness in cases to which he has been assigned." [3] We do not believe, however, that permitting the testimony in the distinctive circumstances of this case would create any "real likelihood" of enmeshment in the future. The balancing of need against harm, which evaluation of this evidentiary privilege always involves, leads us to conclude that the testimony should have been required for the following reasons:

■ The issue on which the testimony was sought was central to the case. On the basis of the legal assumptions applied by the ALJ and presumably adopted by the Board, if the alleged oral agreement existed, the challenged ballots should not have been counted, the union was not elected, the certification was invalid, and the unfair labor practices never occurred.

■ The issue did not pertain to the internal deliberations of the agency, *see, e.g., International Ass'n of Machinists & Aerospace Workers, supra,* nor to the accuracy or completeness of its investigative work product, *see, e.g., J.H. Rutter Rex Mfg. Co., supra,* and *Stephens Produce Co., supra.*

**3.** Telegram of John Irving to Henry Hamburger (June 7, 1978), Jt.App. at 106. We are well aware that this response of the General Counsel was not carefully framed for the occasion at hand but was, to put it bluntly, boilerplate. See the strikingly similar statement provided in *Stephens Produce, supra,* 515 F.2d at 1376, and in *M.S.P. Industries, supra,* 568 F.2d at 178 n. 20. One can hardly blame the General Counsel for going with a winning formulation. What such a practice lacks in demonstrated individualized attention it makes up for in demonstrable consistency.

Rather, it concerned an external, operative event which an agency employee had witnessed.[4]

■ The issue was quite specific—whether or not the conversations of the union and company representatives on a particular occasion manifested an intent to exclude a specific class of employees from their agreement—as opposed to more generalized "fishing expeditions" for helpful evidence which have uniformly been rejected, see, e.g., *J.H. Rutter Rex Mfg. Co., supra.*

■ The subpoenaing party's version of the events, which will allegedly be sustained by the Board employee's testimony, is highly plausible. The alleged understanding was not raised here, or even before the ALJ, for the first time. It was asserted in the initial challenge to the ballots lodged with the Regional Director, see Jt.App. at 58, on the union's appeal of that initially successful challenge to the Board, see *id.* at 66, 88, before the hearing officer designated to determine the employee status of the motor route carriers, see *id.* at 76, 88, again before the Board in petitioner's exceptions to the hearing officer's report, see *id.* at 88, and again before the Regional Director in its objections to the election and the revised tally, see *id.* at 80, 81–82. It has been a consistent contention, formally asserted from the earliest time it could have been expected. Moreover, the nature of the alleged agreement is fully consistent with the language of the stipulation—or at least was at the time the stipulation was written. The stipulation places within the agreed-upon unit "[a]ll circulation department *employees, including drivers.*" Jt.App. at 53 (emphasis added). Motor route carriers are assuredly "drivers," but whether they are employees is (or at least was) most doubtful. So much so that the Regional Di-

rector's Report on Challenged Ballots recommended sustaining the company's challenge on the sole ground that these individuals were not employees. See Jt.App. at 60, 65. In other words, petitioner is not urging an agreement which contradicts, or even makes an exception to, the language of the stipulation, except as that language has been given legal content (contrary to the views of the Regional Director) by subsequent Board decision. The ALJ found the company's account not credible because it was "not likely that the Union's lawyer brushed away what was then one-third of the Union's supporters with a 'we are not interested in them' response based upon an alleged acceptance without question of a mere statement that they were independent contractors." 258 N.L.R.B. at 742. It seems to us, however, that the union lawyer had nothing to lose by such a concession if he believed (as subsequently proved to be true) that the stipulation would be interpreted and applied on its face, so that if the motor route carriers *could* be included within the unit (non-employees of course cannot be, even through stipulation) they *would* be. The speculation that the union lawyer took such a gamble seems to us at least as plausible as the only other alternatives that would not clearly invalidate the stipulation, which are (1) that the company readily agreed to the inclusion of a group which (as described in the Regional Director's Report on Challenged Ballots) the company treated substantially differently from the rest of its work force, paying no overtime or fringe benefits and making no payroll deductions; (2) that one or both parties had no specific intent with regard to this large segment of the contemplated unit; or (3) that both parties understood the importance of the issue but intentionally left it to be resolved

---

4. Petitioner asserted before the administrative law judge that Abrams' testimony was needed for the purpose of showing his *own* understanding of the stipulation, on the theory that the Board was a party to it, and that the Board's interpretation was therefore independently relevant. Had this been the only basis on which the company pressed for issuance of the subpoena, an entirely different issue would be presented. In fact, however, counsel also argued before the ALJ that Abrams was the only impartial witness of the contested agreement between the union and the company. Jt. App. at 506. That is the only basis which our discussion assumes to be relevant.

through the Board's determination of who is legally an "employee." [5]

■ The testimony was of unique value with regard to the issue. The only other witnesses who testified were aligned with the company or the union, and their testimony matched their alignment. The ALJ considered it dispositive of the subpoena issue that petitioner had not sought to introduce the testimony of two more of its employees who were present at the crucial meeting. The availability of other evidence is certainly a factor to be considered, but here the effect of that evidence upon the company's case would at best have been cumulative. It cannot be compared with the supporting testimony of a neutral governmental official.

■ Participation of the Board employee in the events bearing upon the issue was of such a character that he was intended to acquire the knowledge which the subpoena seeks to elicit, and the parties would reasonably expect him to convey that knowledge to the Board. As counsel for petitioner (who had been present at the conference) described Abrams' function (uncontradicted by counsel for the union, who had also been present), "he was assisting the parties to enter into the stip[ulation] for cert[ification]." Jt.App. at 143 through unnumbered page after 143. He was also there to make sure that the stipulation, properly understood, was worthy of the Board's approval, so that he could "recommend" it. On both scores, his participation was *designed* to inform him fully of the facts and circumstances bearing upon the meaning of the agreement; and on the latter score that knowledge was meant to affect the Board's action. Thus, it was eminently reasonable for the parties to expect an employee in Abrams' position to enlighten the Board on the events he was assigned to witness. And that is all the subpoena demands. The Board's leading case giving effect to an oral

agreement varying the content of a stipulation for certification emphasized the fact that the agreement was made "in the presence of a Board agent" and "before a Board agent." *Banner Bedding, Inc.,* 214 N.L.R.B. 1013, 1013–14 (1974). That fact would have been irrelevant if the agent's knowledge regarding the existence or nonexistence of the agreement could never affect the Board's on-the-record decision—which only his testimony can achieve.

■ ■ The proceeding is not a private action, but a complaint pressed by the Board itself against the party who asserts the need for the testimony. It is repugnant to notions of fairness for the government to seek sanctions for alleged wrongdoing while withholding from the proceeding evidence that would demonstrate innocence. *Cf. Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963) (suppression by criminal prosecutor of evidence favorable to an accused violates due process). That is not the same as saying that the object of government action has an unqualified right to demonstrate the existence of such evidence through subpoena of agency officials, but the case for subpoena is stronger than it is where the government is not involved in the proceeding, or is involved on the side of the subpoenaing party.

The cumulative effect of all these considerations is to render the privilege inapplicable in this case. We recognize that the Board Agent's action in midwifing a stipulation for certification is akin to agency mediation—which this court and others have found requires broad protection through the evidentiary privilege here at issue. *See NLRB v. Joseph Macaluso, Inc., supra; International Ass'n of Machinists & Aerospace Workers, supra.* In such a process it is, as we have said, essential that the government agency be "in the condition where it is persona grata to both parties."

---

**5.** There is also a fourth alternative, which is that each of the parties had a different intent, either expressed or unexpressed at the conference. This, however, must be excluded from the calculation—or included only to strengthen the plausibility of a state of facts that would vindicate the petitioner—since under the Board's precedent such a failure of the parties to "reach a meeting of the minds [on] the stipulation" would invalidate it. *See Buckley Southland Oil,* 210 N.L.R.B. 1060, 1061 (1974).

425 F.2d at 539. In the negotiation of a representational unit, it is important that each side be relieved of fear that the other side and the Board Agent will combine their oral testimony to introduce unintended elements into the written agreement. But no such fear can be created by our refusal to recognize the evidentiary privilege in the present case, since we are only compelling employee testimony that is sought for the purpose of undermining the Board's position. As for the other valid agency concern—the fear that, impairment of persona grata status or not, Board Agents will be diverted from their duties by recurrent requests for testimony—the concurrence of factors as strong as those set forth above will seldom occur, even in the context of stipulations for certification. To eliminate virtually all possibility of recurrence, it might well be sufficient to state prominently on the Board's form (upon which the stipulations are typed) that the Board Agent will not be permitted to testify regarding the statements and intentions of the parties. Such explicit notice that the parties are left to their own resources would affect our view of the matter.

■ We therefore find that the Board's action must be set aside because it was taken without observance of procedure required by law, 5 U.S.C. § 706(2)(D) (1976). Although our holding on this point alone requires remand to the agency, we proceed to consider the other issues properly presented,[6] so that a repetitive appeal may be avoided.

### Specificity of the Complaint

■ Petitioner asserts that the complaint did not specify each instance in which the employer failed to deal directly with the union, and objects to the ALJ's refusal to require a bill of particulars. Not even the courts any longer require adherence to the technicalities of common law pleading. In

NLRB cases, "[i]t is sufficient that the respondent 'understood the issue and was afforded full opportunity to justify its actions.'" *Bakery Wagon Drivers & Salesmen, Local 484 v. NLRB*, 321 F.2d 353, 356 (D.C.Cir.1963) (quoting *NLRB v. Mackay Co.*, 304 U.S. 333, 350, 58 S.Ct. 904, 912, 82 L.Ed. 1381 (1938)). On that score, the administrative law judge's response seems to us correct and conclusive: "Respondent had what was more complete than a bill [of particulars], namely, the supporting evidence itself on the record (almost entirely supplied by its own witness), and was allowed a substantial adjournment in which to gather and supply any different or ameliorating evidence, which it did not do." 258 N.L.R.B. at 750 n. 19.

### Statute of Limitations

■ Petitioner argues that the six-month statute of limitations, 29 U.S.C. § 160(b) (1976), bars prosecution of several of the unilateral changes. It challenges the Board's finding that "[w]ith the exception of the mailroom relocation, all the unilateral changes which the Administrative Law Judge found to be unlawful occurred after Respondent's refusal to bargain on January 3, 1977." 258 N.L.R.B. at 734. If this was intended as a statement of fact, it does not comport with the ALJ's findings, nor does it have substantial support in the record. The ALJ found that the demotion of the mail clerk to part-time status and the substitution of district sales representatives for district advisors occurred wholly in 1977. 258 N.L.R.B. at 749. With regard to the replacement of motor route carriers with delivery contract holders, however, the ALJ merely found that "the bulk" of the changes occurred in 1977 and 1978, *id.* at 750 n. 20, and there is no support for a broader statement in the record. He appears to have found that the replacement of

---

**6.** The petitioner makes a second attack upon the validity of the election, urging that it must be rerun because the motor route carriers received inadequate notice. Since there was no appeal to the Board from the administrative law judge's disposition of this issue, it is fore-

closed here. *See Detroit Edison Co. v. NLRB*, 440 U.S. 301, 311 & n. 10, 99 S.Ct. 1123, 1129 & n. 10, 59 L.Ed.2d 333 (1979); *Puerto Rico Drydock & Marine Terminals, Inc. v. NLRB*, 284 F.2d 212, 215–16 (D.C.Cir.1960).

drivers with hauling contract holders began prior to 1977 as well. *See id.* at 749. It may be that the Board meant its statement as a conclusion of law rather than a statement of fact, concluding that if the "bulk" of the personnel change effected by a particular management decision occurs after a certain date the entire change is attributed to that period. If such a principle (the validity of which we do not here consider) was being established, it was incumbent upon the Board to express it. Without such expression, the Board's decision fails to set forth the required "reasons or basis" as required by 5 U.S.C. § 557(c)(A) (1976) and it must be set aside under 5 U.S.C. § 706(2)(D) (1976).

### LIABILITY OF PARENT COMPANY

Petitioner argues that insufficient evidence existed for the conclusion that Drukker Communications, Inc., was vicariously liable for the unfair labor practices of The Daily Advance, Inc. The ALJ relied on three findings to support liability:

■ that all shares of The Daily Advance, Inc., are owned by Drukker Communications, Inc., and that The Daily Advance, Inc., is a wholly owned subsidiary of Drukker Communications, Inc., [2] that the officers and directors of Drukker Communications, Inc., and of The Daily Advance, Inc., are the same and that, [3] for the purposes of this proceeding, the change from Union Building and Investment Company trading as The Daily Advance to The Daily Advance, Inc., was a change in name only.

258 N.L.R.B. at 736 n. 1.

■ The last of these, if it was even meant as a factual determination rather than a conclusion of law, is contradicted by the record. Petitioner's Amended Answer alleged that the assets and liabilities of the newspaper had been sold to the new corporation; this was never contested. The first two findings have support in the record, but are inadequate to sustain the conclusion of liability. To find a parent corporation liable for the unfair labor practices of its subsidiary under either an agency or inte-

grated enterprise theory, the Board must find that the parent involved itself in the labor relations of the subsidiary. *See Bethlehem Steel Co. v. NLRB,* 120 F.2d 641, 650 (D.C.Cir.1941) ("personal interference" of sole stockholder required to make it an employer within the Act); *Great Chinese American Sewing Co. v. NLRB,* 578 F.2d 251, 254 (9th Cir.1978) ("[t]he four criteria for determining the existence of an integrated enterprise [are] interrelation of operations; common ownership or financial control; common management; and centralized control of labor relations"); *NLRB v. Condenser Corp.,* 128 F.2d 67, 71 (3d Cir.1942) (parent and subsidiary jointly liable for unfair labor practice when they "together, ... act as employers of those employees ... and together actively deal with labor relations of those employees"); *NLRB v. Swift & Co.,* 127 F.2d 30, 32 (6th Cir. 1942).

No evidence was presented to show such an involvement. The fact that The Daily Advance, Inc., was wholly owned by Drukker Communications, Inc., and that the officers and directors of the two corporations were identical does not make the actions of the one company automatically the actions of the other. *See Escude Cruz v. Ortho Pharmaceutical Corp.,* 619 F.2d 902, 905 (1st Cir.1980) ("whether the subsidiary is only an empty shell is a question of fact, and allegations of interlocking directorates and stock ownership will not alone suffice"); 1 W. Fletcher, *Cyclopedia Of The Law Of Private Corporations* § 43 at 209 (1974) ("[o]wnership of all the stock of a corporation coupled with common management and direction does not ... operate as a merger of the two corporations into a single entity"). The fact that Drukker is the successor to UBI, which formerly owned the newspaper and conducted its employment relations, would be determinative if there were indeed "a change in name only"; but in fact the assets and liabilities of the newspaper were conveyed to an entirely separate corporation. 258 N.L.R.B. at 736 n. 1. It appears from the record, moreover, that Drukker is not merely a holding company

for The Daily Advance, Inc., but conducts independent business of its own. *Id.* at 738. The only evidence (other than common ownership and management) pertaining to the relationship between the two companies is the fact that the circulation department of The Daily Advance, after its move to Roxbury, serviced other publications of Drukker. *Id.* This is not enough, without further elaboration, to demonstrate that the parent "involved itself" in labor relations matters pertaining to those employees. In any event, the ALJ (and hence, we must assume, the Board) did not weigh this factor but evidently considered the inadequate factors set forth above conclusive. Insofar as it affects Drukker Communications, therefore, the Board's action must be set aside as unsupported by substantial evidence. 5 U.S.C. § 706(2)(E) (1976).

### Employee Status of District Advisors

[9] Petitioner attacks the finding that district advisors were properly included within the bargaining unit. It asserts that they were exempt "supervisors" within the meaning of the Act—which means supervisors of employees. There is no doubt that the district advisors recruited, trained, and replaced (which are activities potentially included among the supervisory functions listed in the Act, 29 U.S.C. § 152(11) (1976)) individuals whom we will only fleetingly, for the purpose of reader comprehension, describe as newsboys, but hereinafter call "youth carriers." Petitioner's ironic contention on this point is that the youth carriers *were* employees, so that the district advisors were supervisors of employees, and hence not employees, but supervisors. The ALJ's only justification for his finding that the youth carriers were independent contractors was his assertion that "Respondent and

the Union have been in agreement from the outset that the youngster carriers are not employees within the meaning of the Act (testimony of their respective lawyers, Hamburger and Parsonnet)." 258 N.L.R.B. at 743. No record evidence supports that finding. There was no stipulation to that effect, nor even informal expressions by counsel which suggest that was their common understanding, if indeed that would suffice to take the issue out of the case. In fact, we can find no statement of either lawyer or of any witness that expresses even an individual belief that the youth carriers were independent contractors.[7] Absent the agreement which the ALJ erroneously found, the Board's action required a finding that the district advisors did not supervise, or that the individuals whom they supervised were not employees. Neither was made. Since the Board failed to make a finding on a material issue of fact, 5 U.S.C. § 557(c)(A), its determination on this point must be set aside for failure to observe procedure required by law, 5 U.S.C. § 706(2)(D).

### Employee Status of Delivery Contract Holders

██ Petitioner challenges the finding that delivery contract holders were employees. It argues that since they derived their income principally from the difference between the wholesale and retail price of the papers they received, their status should have been controlled by the Board's cases finding a newspaper distributor to be an independent contractor when his "income is based on the difference between the price at which he sells the papers, less the price he pays the Company for the papers and the labor costs and losses incurred." *Las Vegas*

---

7. The closest to it is the following statement, on cross-examination, of The Daily Advance's Circulation Director:

Q Do the district sales representatives have any greater authority over the carriers than did the district advisors previously?
. . . .
A Well any greater authority over the carriers? Again the carrier organization is the little merchant system.

I don't know.
Maybe you mean the carriers are not employees?
Jt.App. at 346.
This would be slim evidence to support even a finding of independent contractor status—much less a finding that the company had conceded independent contractor status.

*Sun, Inc.,* 219 N.L.R.B. 889, 891 (1975). *See Donrey, Inc.,* 223 N.L.R.B. 744 (1976). The ALJ's decision rejected this argument because the motor route carriers received weekly stipends, assuring the profitability of their routes, which distinguished them from the distributors in *Las Vegas Sun* and *Donrey.* 258 N.L.R.B. at 746 n. 14. That explanation was adequate at the time it was written and at the time it was adopted by the Board, but petitioner asserts it has been rendered inadequate because of the subsequent decision of the Board in *Fort Wayne Newspapers,* 263 N.L.R.B. No. 112 (Aug. 31, 1982). There a stipend of the sort found conclusive in the present case also existed, but the distributors were nonetheless held to be independent contractors.

The process of developing rational principles through adjudication—especially principles of "mixed law and fact" of the sort at issue here—necessarily causes elements recited as determinative in an earlier case to be found nondeterminative in a later case where additional and perhaps unforeseen elements must be considered. This is the very nature of the adjudicatory, "case law" process. Thus, while a later case can justly be criticized for failure to distinguish an earlier one, the reverse cannot be true. Though circumstances may exist in which we would feel justified in requiring reformulation of an earlier Board decision in order to take account of a later case, *see Local 814, International Brotherhood of Teamsters v. NLRB,* 512 F.2d 564 (D.C.Cir. 1975), that is assuredly the exception rather than the rule. *See City Cab Co. v. NLRB,* 628 F.2d 261, 266 n. 22 (D.C.Cir.1980). The Board's judgment that delivery contract holders are employees was supported by substantial record evidence and was accompanied by a reconciliation of earlier holdings that was adequate at the time. We therefore do not set aside the Board's decision on this ground. Since, however, our remand on other grounds now requires the Board to reconsider this case subsequent to *Fort Wayne,* we expect that the Board's final statement of "reasons or basis" will be visibly consistent with that decision as well. *See* 5 U.S.C. § 557(c)(A).

CHANGE OF LOCATION

 Finally, petitioner claims that the change in the mailroom's location, from Dover to Roxbury, renders the bargaining unit inappropriate. It argues that the stipulation was limited to the Dover plant, and that even if it were not, that the new locale overcomes the presumption of continuing majority support. The ALJ's finding on this issue was supported by substantial evidence. Since the reference to the Dover location was contained in the stipulation's jurisdictional provision, entitled "Commerce," rather than in the section entitled "The Appropriate Collective Bargaining Unit," it is reasonably interpreted as not specifically limiting the parties' agreement on the latter point. Jt.App. at 52–53. And while a move in connection with other factors can eliminate the presumption of continuing majority support, *see NLRB v. Massachusetts Machine & Stamping, Inc.,* 578 F.2d 15 (1st Cir.1978), the move alone is not conclusive, *see Republic Engraving & Designing Co.,* 236 N.L.R.B. 1150 (1978). On the basis of the record here, the ALJ was justified in concluding that the presumption had not been overcome.

We grant the petition and remand the case to the Board for proceedings not inconsistent with this opinion.