849 F.2d 15
 128 L.R.R.M. (BNA) 2665, 109 Lab.Cas. P 10,557
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
WESTINGHOUSE BROADCASTING AND CABLE, INC., (WBZ-TV), Respondent.
International Brotherhood of Electrical Workers, AFL-CIO,
Local 1228, Intervenor.
 No. 87-1886.
 United States Court of Appeals,
First Circuit.
 Heard April 7, 1988.
Decided June 9, 1988.
 
 Fred L. Cornnell with whom Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, and Howard E. Perlstein, Supervisory Atty., Washington, D.C., were on brief, for petitioner.
 Alan H. Shapiro with whom Sandulli & Grace, Boston, Mass., was on brief, for intervenor.
 Don T. Carmody with whom Carmen M. DiRienzo and Carmody DiRienzo & Goldstein, New York City, were on brief, for respondent.
 Before COFFIN, TORRUELLA and SELYA, Circuit Judges.
 TORRUELLA, Circuit Judge.
 
 
 1
 Petitioner, the National Labor Relations Board ("the Board"), seeks enforcement of its order against Westinghouse Broadcasting and Cable, Inc.--WBZ-TV ("the Company") to reinstate a unit of news couriers (consisting of two employees), to reimburse them for any lost wages, and to bargain with Local 1228, International Brotherhood of Electrical Workers, AFL-CIO ("the Union"), as the unit's exclusive representative. The Board found that the Company's unilateral decision to eliminate the unit and to subcontract their work concerned a mandatory subject of bargaining. It concluded, therefore, that the Company had violated Sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. Secs. 158(a)(1) and (5), by failing to afford the Union an opportunity to bargain with respect to that decision. We agree and grant enforcement of the Board's order.
 
 
 2
 * The Company employed several news couriers from 1977 to late 1983 to transport tapes, press releases, and accessories from the newsroom to various locations and to otherwise provide miscellaneous transportation services for the news department.[1] In June of 1983, the Union filed with the Board a petition to represent the couriers. At an informal conference on July 13, the Company and the Union agreed to hold an election on August 19 to allow these employees to decide whether the Union would represent them. The parties signed a "Stipulation for Certification Upon Consent Election" which established a voting eligibility date of July 16: all persons employed as couriers on that date and on election day would be eligible to vote. The Company claims, and the Union denies, that the parties also orally agreed then that one other employee, Chou, would be able to vote. On July 16, the Company employed three news couriers: Weed, who worked only half-time, and Lungelow and McDonagh. Chou was transferred from another department of the Company and started his duties as a courier on July 18. Lungelow and McDonagh were discharged on August 5 (these discharges are not at issue here). All four, however, voted on August 19. Weed voted for the Union. The other three votes were challenged. On October 12, the Board's Regional Director concluded Lungelow and McDonagh were ineligible to vote. This left only Weed's affirmative vote and Chou's challenged vote.
 
 
 3
 Shortly thereafter, in what was at that time an unrelated development, the Company sold its Satellite News Channel (SNC). SNC, employing 11 individuals, was a separate division with its own budget. The news couriers were not a part of SNC. When it was sold, the Company's parent directed the Company to correspondingly reduce its staff ("body count") by 11 positions. However, the Company did not abolish eleven positions in response to its parent's directive, nor did it dismiss all, or only, SNC personnel; at most, only eight SNC "bodies" were eliminated by the company as a result of its divestment of SNC. The company did decide, however, to terminate the unit of news department couriers, which then consisted only of Weed and Chou.[2]
 
 
 4
 On November 9, 1983, the Company filed a motion to dismiss the election petition because of its decision to eliminate the unit. The Union filed its opposition on November 18 and requested the Company to bargain over the decision. The Company refused and, on November 21, the Union filed an unfair labor practice charge with the Board.
 
 
 5
 The Board denied the Company's petition to dismiss the election petition and ordered a hearing to address the validity of Chou's disputed vote. The Board's hearing officer then ruled that Chou was not eligible to vote because he did not begin to work as a courier until two days after the eligibility date. He also found that there was no indisputable oral agreement between the parties regarding Chou's eligibility. Because he found that there was a written stipulation for certification and a real dispute as to the existence of the oral agreement, he restricted the number of witnesses on the issue of the oral agreement and did not attempt to determine in whose favor lay the preponderance of the evidence. In particular, he refused to issue a subpoena to obtain the testimony of the Board agent who was present at the July 13 meeting at which the alleged oral agreement was made. Based on Board rules created by administrative adjudication in Norris-Thermador , 119 N.L.R.B. 1301 (1958) and Banner Bedding, 214 N.L.R.B. 1013 (1974), the hearing officer rejected consideration of the oral agreement simply because there was a genuine dispute as to its existence.
 
 
 6
 The hearing officer also determined that the Company's elimination of the unit after the election did not bar the Board from certifying the Union as the unit's bargaining agent, reasoning that upon certification the Company would have to bargain with the Union over the decision to terminate the unit. Finally, the hearing officer determined that, based on Weed's vote, the Union had won the election by a vote of 1-0. On October 19, 1984, the Board adopted the hearing officer's recommendations and certified the Union as the bargaining representative of the couriers.
 
 
 7
 Meanwhile, beginning on December 2, 1983 (that is, after the election but prior to certification of the Union), the Company subcontracted the work of the news couriers. In a complaint issued December 27, 1984, the Union charged that the Company had violated Sections 8(a)(1) and (5) of the National Labor Relations Act[3] by subcontracting the work without allowing the Union an opportunity, as elected representative of the courier unit, to negotiate with respect to the decision to eliminate that unit. In its defense before the administrative law judge (ALJ) who heard this case on behalf of the Board, the Company presented essentially the same arguments it presents to us. It argues, first, that the Board, in its October 19, 1984 decision, improperly declined to hear evidence of the oral agreement regarding Chou's eligibility to vote and thus incorrectly sustained the Union's challenge to that vote; second, that since the decision to eliminate the unit and to subcontract the courier work was made prior to the Union's certification, it was not required to bargain with the Union regarding the decision; third, that the decision to eliminate the unit and to subcontract its work is not a mandatory subject of bargaining; and, finally, that it was under no duty to bargain regarding this issue because the unit consisted of no more than one person at the time the Union requested bargaining.
 
 
 8
 The ALJ rejected these arguments. She formulated an order that the Company, inter alia, offer Weed and Chou their former positions and make them whole for any wages lost from the termination of their unit, and, upon request, recognize and bargain collectively with the Union regarding wages and other working conditions of the unit. The Board adopted and issued this recommended order. It now seeks enforcement.
 
 II
 
 9
 We note first that "Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." NLRB v. A.J. Tower Co., 329 U.S. 324, 330, 67 S.Ct. 324, 328, 91 L.Ed. 322 (1946). The discretion we accord the Board in this area encompasses its determination of voter eligibility issues. See NLRB v. New England Lithographic Co., 589 F.2d 29, 33 (1st Cir.1978). Furthermore, procedures and safeguards established by the Board to carry out its legislative mandate should not be disturbed unless they are "without justification in law or reason," Tower, 329 U.S. at 332, 67 S.Ct. at 329, or contrary to congressional policy embodied in the National Labor Relations Act. See Wallace Corp. v. NLRB, 323 U.S. 248, 254-55, 65 S.Ct. 238, 241-42, 89 L.Ed. 216 (1944).
 
 
 10
 Respondent's first argument presents a rather straightforward legal question: whether a genuine dispute as to the existence of an oral agreement regarding those allowed to vote in a union election justifies a refusal to consider further the existence of such an agreement.[4]
 
 
 11
 The Board long ago established a rule, in Norris-Thermador Corp., 119 N.L.R.B. 1301 (1958), that only a written and signed voter eligibility agreement will be considered a final determination of voter eligibility issues. See also Cooper Mattress Manufacturing Co., 225 N.L.R.B. 200 (1976). The rationale of this rule is persuasive:
 
 
 12
 The obvious purpose of the [Norris-Thermador ] requirement of an express writing ... is to prevent the possibility of any party's obfuscating Board election procedures by pressing for litigation of eligibility claims based on alleged oral agreements, since occasions for discord or delay arise if there is any difference of opinion regarding the actual understanding reached by oral agreement.
 
 
 13
 Banner Bedding, Inc., 214 N.L.R.B. 1013, 1014 (1974). We need only note briefly that this rule is neither "without justification in law or reason," nor contrary to congressional intent, embodied in the National Labor Relations Act, "to prescribe orderly and peaceful procedures" for avoiding labor strife and preserving the rights of management and labor. See 29 U.S.C. Sec. 141(b). It is thus within the scope of the Board's authority and expertise to promulgate such a standard.
 
 
 14
 The Board did carve "a narrow exception to Norris-Thermador " in Banner Bedding, 214 N.L.R.B. 1013, 1014 (1974). Under this exception, the Board will recognize and enforce an oral agreement only under the "specific circumstances" where both parties agree to its contents. Id. The Board explicitly stated that it would "continue to apply Norris-Thermador, and thereby preclude litigation of the matter, where there is any dispute whatsoever as to whether there was a firm [oral] agreement." Banner Bedding, 214 N.L.R.B. at 1014 (emphasis supplied).
 
 
 15
 This case clearly falls outside the Banner Bedding "narrow exception" to the Norris-Thermador rule for the simple reason that the Union contests not only the contents, but the very existence, of an oral agreement regarding Chou's eligibility. Under the Norris-Thermador rule, once the hearing officer concluded that there was a genuine dispute as to whether the parties had reached an oral agreement regarding Chou's status, he properly ended further inquiry into the matter since, as he stated, "even if the weight of the evidence favored the existence of an oral agreement, it was not the type of unequivocal agreement that would be considered by the Board as determinative."
 
 
 16
 The Company's reliance on Drukker Communications, Inc. v. NLRB, 700 F.2d 727 (D.C.Cir.1983) as contrary authority is misplaced. In Drukker, the parties had signed a stipulation that "[a]ll circulation department employees, including drivers" were to be included in a unit to vote on union representation. After the election, the company challenged several ballots on the basis that the parties had orally agreed, before a Board agent, that this phrase was not to include "motor route carriers." The administrative law judge who considered the issue, however, refused to allow the company to subpoena the Board agent to testify regarding the alleged oral understanding of the disputed phrase. The rationale for the denial of the subpoena was not based on the Norris-Thermador rule, but stemmed from a fear that, if the Board agent was required to testify, the future effectiveness of Board agents in resolving disputes might be seriously impaired due to inhibitions caused by the parties' concerns that the agent may later testify against their interests. 700 F.2d at 731.
 
 
 17
 The court, however, concluded that the Board should have issued the subpoena, reasoning that the parties' need for the evidence outweighed any potential harm to the future effectiveness of Board agents. Id. at 731-34. In so ruling, the court specifically noted that "the nature of the alleged [oral] agreement is fully consistent with the language of the stipulation" since the agreement concerned only the interpretation of the ambiguous term; that is, whether "all circulation department employees" included "motor route carriers." Id. at 732. In particular, the court stated that "petitioner is not urging an agreement which contradicts, or even makes an exception to, the language of the stipulation, except as that language has been given legal content (contrary to the views of the Regional Director) by subsequent Board decision." Id.[5]
 
 
 18
 Drukker, therefore, provides no support for the Company's attempt to expand the Banner Bedding exception to the Norris-Thermador rule. First, Drukker did not directly address the issue of whether the Board must consider evidence of an oral election agreement once the existence of the agreement is put into dispute. Instead, that opinion was concerned with the extent to which a Board agent can assert a privilege to avoid giving testimony regarding the interpretation of a written election agreement. Secondly, the court specifically noted that there was no conflict between the stipulation and the alleged oral agreement; rather, the oral agreement concerned only the interpretation of an ambiguous term. In the case before us, however, there would be a conflict caused by the alleged oral agreement: the stipulation sets a July 16 eligibility date while the oral agreement would make Chou eligible even though he was not a member of the unit on that date. We believe that this is precisely the type of litigious situation the Norris-Thermador rule was very rationally designed to avoid.[6]
 
 III
 
 19
 The Company next challenges the Board policy that an employer who makes unilateral changes in employment conditions, after an election but prior to certification of the union, does so at its peril. It claims that this policy is contrary to the decisions of the Supreme Court announced in NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), and Linden Lumber Division v. NLRB, 419 U.S. 301, 95 S.Ct. 429, 42 L.Ed.2d 465 (1974).
 
 
 20
 In Mike O'Connor Chevrolet-Buick-GMC Co., Inc., 209 N.L.R.B. 701, enforcement denied on other grounds, NLRB v. Mike O'Connor Chevrolet-Buick-GMC Co., Inc., 512 F.2d 684 (8th Cir.1975), the Board established the rule that an employer violates Section 8(a)(1) and (5) of the National Labor Relations Act, see supra n. 3, by implementing unilateral changes after an election and while election objections are pending, if the election ultimately results in the union's certification. Under this rule, absent "compelling economic considerations," an employer "acts at its peril" by unilaterally changing working conditions during the pendency of election issues. Id. at 703. The policy behind this rule is to not allow employers "to box the union in on future bargaining positions by implementing changes of policy and practice during the period when objections or determinative challenges to the election are pending." Id. The policy also discourages the employer from postponing bargaining obligations by filing spurious challenges to an election. NLRB v. Sandpiper Convalescent Center, 824 F.2d 318, 320 (4th Cir.1987) (citing Fugazy Continental Corp. v. NLRB, 725 F.2d 1416, 1421 (D.C.Cir.1984)).
 
 
 21
 We fail to see the Company's perceived conflict between this rule and the Court's decision in Gissel. The Court held there that the Board may properly issue a bargaining order absent any election at all if an employer has acted to interfere with the election process. 395 U.S. at 614, 89 S.Ct. at 1940. In so ruling, the Court noted that "[a]lmost from the inception of the [National Labor Relations] Act ... it was recognized that a union did not have to be certified as the winner of a Board election to invoke a collective bargaining obligation...." Id. at 596-97, 89 S.Ct. at 1931. The Court also observed that Congress, in 1947, rejected an amendment to the Act which would have allowed the Board to find a refusal-to-bargain violation only if the union was "recognized by the employer or certified as such...." Id. at 598, 89 S.Ct. at 1932. While the Court's language on this issue is dictum, used to support the Board's policy of recognizing a union basing its claim to representation status on its possession of union authorization cards, it does suggest deference to the Board's discretion in its use of bargaining orders requiring negotiation with non-certified unions.
 
 
 22
 Nor do we find conflict between the Board's policy and the Court's decision in Linden Lumber. There, the issue before the Court was the Board's use of its discretion to refuse to find an employer guilty of unfair labor practices because it failed to negotiate with a union claiming representation based on authorization cards. 419 U.S. at 302-03, 95 S.Ct. at 430-31. The Court sustained the Board's decision that the union should instead seek an election.
 
 
 23
 We find Linder Lumber inapposite to the issue before us for two reasons. First, Linden Lumber concerned whether an employer must bargain when no representation election has yet taken place; the decision "simply [did] not address" the employer's duty to bargain after an election and before resolution of all disputes regarding voter eligibility. NLRB v. Sandpiper Convalescent Center, 824 F.2d at 321 n. 1. The Court itself implicitly distinguished authorization cards from the election process when, in its conclusion, it agreed with the Board that the union "has the burden of taking the next step in invoking the Board's election process." Linden Lumber, 419 U.S. at 310, 95 S.Ct. at 434.
 
 
 24
 Perhaps more importantly, Linden Lumber was not a directive to the Board that it can never require bargaining with an uncertified union claiming legitimacy based only on authorization cards. Instead, it was a recognition that the Board's decision was not "arbitrary and capricious or an abuse of discretion." Id. at 309-10, 95 S.Ct. at 434. Therefore, we understand the Court's decision in that case to represent a reaffirmance of judicial deference to Board discretion in its handling of labor disputes arising during the delicate process of establishing union representation.[7]
 
 
 25
 The Company also points to some policy considerations. It contends that it is unfair to "bind the hands" of an employer, by the threat of "punishment" for making employment related changes without bargaining, while certification is pending. We disagree. First, the employer takes no risk in making unilateral changes in conditions and terms of employment during this period if it does so for "compelling economic considerations." Mike O'Connor Chevrolet, 209 N.L.R.B. at 703. Furthermore, we do not believe it is so unfair to encourage an employer to bargain with a union which has won a Board supervised, and thus presumptively fair election, and with which the employer will have to bargain in the future if the election is upheld. Finally, if the employer is certain that improperly cast votes won the election for the union, it can make whatever unilateral changes it desires since it would violate the Act only if the election results were affirmed.
 
 
 26
 The Company is also concerned about the ramifications of bargaining with a union that is not ultimately certified. First, it argues that to bargain in such a situation would be a violation of Section 8(a)(2) of the Act which makes it an unfair labor practice for an employer "to dominate or interfere with the formation or administration of any labor organization or contribute ... support to it." 29 U.S.C. Sec. 158(a)(2). Yet, although the Mike O'Connor rule has been in effect for fourteen years, the Company can point to no instance in which an employer has been in violation of the Act for bargaining with a union after it has won an election. In light of obvious due process considerations, we think it highly unlikely that any court would support a finding that an employer is in violation of the Act for bargaining with a presumptively victorious union when, due to clear Board policy, it would run the risk of a violation if it had refused to bargain with that union.
 
 
 27
 The Company is also concerned about de facto recognition of the union simply by the act of bargaining. We believe, however, that it is also highly unlikely that a Board ruling would survive an "arbitrary and capricious" test if the ruling resulted in the "de facto " recognition of a union because the employer, due to the Mike O'Connor rule, bargained after an election.
 
 
 28
 We therefore join the growing list of circuits who have expressed approval of the Mike O'Connor rule. See NLRB v. Sandpiper Convalescent Center, 824 F.2d 318 (4th Cir.1987); Fugazy Continental Corp. v. NLRB, 725 F.2d 1416 (D.C.Cir.1984) (per curiam ); NLRB v. McCann Steel Co., 448 F.2d 277 (6th Cir.1971); see also Dow Chemical Co. v. NLRB, 660 F.2d 637 (5th Cir.1981) (Mike O'Connor rule also applies when union loses decertification election--choice of employees must be honored immediately).
 
 IV
 
 29
 The Company next argues that the decision to terminate the unit and to subcontract the courier work was not a mandatory subject of bargaining. This argument, however, is contrary to Supreme Court precedent and to the facts of this case.
 
 
 30
 Neither party contests the Board's general rule that a management decision is a mandatory subject of bargaining if the decision turns primarily on a consideration of labor costs. See Otis Elevator Co., 269 N.L.R.B. 891, 893-94 (1984) (interpreting, and apparently simplifying, the mandated balancing test of First National Maintenance v. NLRB, 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981)). The Company asserts that the decision did not "turn upon" labor costs because it resulted directly from a change in the direction of its business caused by the elimination of SNC. It supports its argument by pointing out that the Company never weighed the relative cost of subcontracting out the courier work prior to eliminating the unit.
 
 
 31
 We believe, however, that the facts of this case fall squarely within the holding of Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). In that case, the Court agreed with the Board that the elimination of a unit of maintenance employees and the contracting of their work to an independent company was a statutory subject of collective bargaining. The factual parallels between Fibreboard and this case are striking. In Fibreboard, the Court noted the following:
 
 
 32
 The Company's decision to contract out the maintenance work did not alter the Company's basic operation. The maintenance work still had to be performed in the plant. No capital investment was contemplated; the Company merely replaced existing employees with those of an independent contractor to do the same work under similar conditions of employment. Therefore, to require the employer to bargain about the matter would not significantly abridge his freedom to manage the business.
 
 
 33
 Id. at 213, 85 S.Ct. at 404.
 
 
 34
 Similarly, in findings amply supported by the record and not seriously challenged by the Company, the administrative law judge in this case concluded that the role of the couriers is performed in virtually the identical manner by the subcontractors as it had been by the Company's own employees:
 
 
 35
 The individuals who have performed the courier services since December 2, 1983 perform the same job functions as did the news couriers employed by the Company. They continue (as did the news couriers employed by the Company) to receive their job assignments from the assignment desk editor. Courier service functions are still supplemented with taxicabs where necessary. Although the employee couriers used company vehicles and the outside couriers use their own vehicles, the elimination of the staff courier positions did not necessitate or lead to the sale of any assets, vehicles, or equipment. Courier service is still available to the newsroom staff during the entire time that the news gathering function is being performed.
 
 
 36
 These findings illustrate that, like in Fibreboard, the decision to contract out the unit's work "did not alter the Company's basic operation." 379 U.S. at 213, 85 S.Ct. at 404. Indeed, it seems to have hardly altered the operation at all. Nor did it involve any "capital investment." This appears to be precisely the type of case where "the Company merely replaced existing employees with those of an independent contractor to do the same work under similar conditions of employment." Id. Thus, requiring the Company to bargain about the decision "would not significantly abridge [its] freedom to manage the business." Id.
 
 
 37
 The Company's attempt to distinguish Fibreboard on the basis that management's decision in that case was motivated expressly by considerations of labor costs is unavailing. Although perhaps more obscured here, there is no other logical reason for the Company's decision. That decision was caused by a directive from the Company's parent to reduce the Company's "body count" by eleven persons. The control of the "body count" was found by the ALJ to be simply a method of maintaining the lowest personnel costs necessary to produce the desired product. The fact that the decision to reduce the body count, i.e., reduce labor costs, came as a result of the sale of a division of the Company, is immaterial under the facts of this case.
 
 
 38
 We also briefly note that the Company's decision to eliminate the unit was "amenable to resolution through the bargaining process." First National Maintenance Corp., 452 U.S. at 678-79, 101 S.Ct. at 2580-81. In so doing, we accept the findings of the ALJ as supported by substantial evidence in the record that "the Company could have made a different decision at every stage between its decision to eliminate the jobs made superfluous by the SNC sale and its decision to eliminate the couriers, who were performing still-needed services unrelated to SNC." The ALJ also found that the decision could have been affected by bargaining with the Union, which could have shown the Company that it could save more money and receive superior service by retaining the couriers and possibly expanding the scope of their duties. By bargaining, therefore, the Union could have affected the decision to eliminate the unit.
 
 V
 
 39
 The Company's final contention simply lacks a factual basis. The Company claims that because the decision to eliminate the courier unit was made on November 3, 1983, and Chou was transferred out of the unit shortly thereafter, an inappropriate bargaining unit of one existed when, on November 18, the Union requested negotiation over the decision. However, based on evidence before her, the ALJ determined that Chou's transfer was effective November 28, 1983, several days after the Company was presumed to have received notice of the Union's request to bargain. We thus find the Company's contention to be contrary to the facts as found by the ALJ and supported by the record. Furthermore, regardless of the date of transfer of Chou, we agree with the ALJ that the Company could not avoid an order to bargain over a decision to terminate a unit simply because it succeeded in eliminating the unit before the Union requested negotiation over the decision.
 
 
 40
 For the above reasons, the Board's petition to enforce its order is granted.
 
 
 
 [1]
 The "facts" discussed in this section are those found by the Board. These are supported by substantial evidence in the record of the various hearings involved in this case
 
 
 [2]
 Only Weed was dismissed outright, on December 2, 1983. Chou was transferred to another job within the company, effective November 28, 1983
 
 
 [3]
 Sections 8(a)(1) and (5) of the Act read, in pertinent part:
 (a) It shall be an unfair labor practice for an employer--
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; [and]
 * * *
 (5) to refuse to bargain collectively with the representatives of his employees....
 29 U.S.C. Secs. 158(a)(1) and (5). Among the rights of employees guaranteed by Section 157 is "the right ... to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining." 29 U.S.C. Sec. 157.
 
 
 [4]
 Respondent raised for the first time at oral argument the possibility that the hearing officer's finding, that Chou was not employed as a courier on the eligibility date, was not supported by substantial evidence in the record. Our own review of the record leads us to conclude that the hearing officer's finding was amply supported
 
 
 [5]
 To the extent Drukker contains dicta suggesting Banner Bedding requires that evidence of a disputed oral agreement must always be considered by the Board, see Drukker Communications, Inc., 700 F.2d at 730 n. 1, we disagree
 
 
 [6]
 Because we find that the Norris-Thermador rule is rational and consistent with the Board's congressional mandate, and has been correctly applied to the facts of this case, the Company had no right to the testimony of the Board agent on the issue of the oral agreement. Therefore, we reject the Company's related argument that it was denied due process by the Board's refusal to subpoena the agent
 
 
 [7]
 The Company's reliance on the Board's decision in Retail Store Employees' Union (Irvins, Inc.), 134 N.L.R.B. 686 (1961) is also misplaced. That opinion addressed Section 8(b)(7)(B) of the Act, which expressly restricts union picketing, within twelve months of a valid election, to unions that are "currently certified." 29 U.S.C. Sec. 158(b)(7)(B). In the context of such explicit statutory language, it is of course appropriate for the Board to set the date of certification as the relevant date for ascertaining when there has been a valid election for purposes of union picketing. We note that Congress rejected applying a certification requirement to Section 8(a)(5). See Linden Lumber Division v. NLRB, 419 U.S. 301, 312, 95 S.Ct. 301, 435, 42 L.Ed.2d 465 (1974) (Stewart, J., dissenting)