# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 22, 2015        Decided December 15, 2015

No. 11-1466

SALEM HOSPITAL CORPORATION, DOING BUSINESS AS
MEMORIAL HOSPITAL OF SALEM COUNTY,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

HEALTH PROFESSIONALS AND ALLIED EMPLOYEES,
AFT/AFL-CIO,
INTERVENOR

———

Consolidated with 12-1009

———

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board

———

*Kaitlin A. Kaseta* argued the cause for the petitioner.
*Bryan T. Carmody* was on brief.
*Don T. Carmody* entered an appearance.

*Kellie Isbell*, Attorney, National Labor Relations Board,
argued the cause for the respondent. *John H. Ferguson*,

Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Julie B. Broido*, Supervisory Attorney, were with her on brief.

*David Strom*, *Sam Lieberman* and *Lisa Leshinski* were on brief for the intervenor Health Professionals and Allied Employees, AFT/AFL-CIO, in support of the respondent.

Before: HENDERSON, MILLETT and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Salem Hospital Corporation (Salem) petitions for review of the National Labor Relations Board's (Board) certification of a bargaining unit and its subsequent determination that Salem unlawfully refused to bargain. The thrust of Salem's petition is that the Board's misapplication of its own adjudicatory procedures denied Salem a fair opportunity to contest the bargaining unit's certification. Although the Board's proceedings are indeed gaffe-ridden, Salem has failed to establish that it was prejudiced thereby. For the reasons set forth below, we deny Salem's petition for review and grant the Board's cross-application for enforcement.

## I. BACKGROUND

Section 7 of the National Labor Relations Act (NLRA or Act) provides that employees may "form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining." 29 U.S.C. § 157. An election held to determine whether a union is entitled to represent a group of employees—*i.e.*, a

representation election—must be conducted in " 'laboratory conditions[,]' free from coercion" from employer and union alike. *See SSC Mystic Operating Co. v. NLRB*, 801 F.3d 302, 309 (D.C. Cir. 2015) (citing 29 U.S.C. § 158(a)(1), (b)(1)(A) (prohibiting employer and union from "interfer[ing] with, restrain[ing], or coerc[ing] employees in the exercise" of their collective bargaining rights)).

Particularly relevant here, an employee who acts as a supervisor does not have section 7 rights.[1]  And, like the employer and the union, he may not interfere with an employee's exercise of section 7 rights. *See SSC Mystic*, 801 F.3d at 309.  If a "supervisor's conduct reasonably tend[s] to have such a coercive effect on the employees that it [is] likely to impair their freedoms of choice in the election," the Board finds "supervisory taint." *See Harborside Healthcare, Inc.*, 343 N.L.R.B. 906, 908 (2004).  Supervisory taint affecting a petition for a representation election can result in the dismissal of the petition. *See* Nat'l Labor Relations Bd. Casehandling Manual, Pt. 2, Representation Proceedings (Manual) § 11730.3(a) (2014); *see also id.* § 11028.2; *SSC Mystic*, 801 F.3d at 310.

The Act also charges the Board with determining an appropriate collective bargaining unit.  29 U.S.C. § 159(b). Pursuant to this duty, the Board investigates a petition filed by the employees (or a labor organization acting on their behalf),

---

[1] The Act defines a supervisor as "any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."  29 U.S.C. § 152(11).

4

declaring that they "wish to be represented for collective bargaining and that their employer declines to recognize their representative." *Id.* § 159(b). An employer can agree to conduct an election and resolve disputes after the fact, *see* 29 C.F.R. § 102.62,[2] but if a petition is filed and no agreement is reached, a Board Regional Director (RD) sets a "representation hearing" to determine if the petition concerns a "unit appropriate for the purpose of collective bargaining." *Id.* § 102.67(a). The hearing officer (HO) does not render a decision; rather, his duty is to "inquire fully into all matters and issues necessary to obtain a full and complete record upon which the Board or the [RD] may discharge *their* duties." *Id.* § 102.64(a) (emphasis in original).

The Federal Rules of Evidence are not "controlling" in a representation hearing, 29 C.F.R. § 102.66(a); *see also* Manual § 11216, but by regulation the Board has set forth detailed procedures. For example, all parties "have the right to . . . examine, and cross-examine witnesses, and to introduce into the record documentary and other evidence." 29 C.F.R. § 102.66(a). In addition, the HO "shall, on the written application of any party, forthwith issue subpoenas requiring the attendance and testimony of witnesses and the production of any evidence . . . under their control." *Id.* § 102.66(c); *accord* 29 U.S.C. § 161(1). Based on the record the HO assembles, the RD may "direct an election, dismiss the petition, or make other disposition of the matter." 29 C.F.R. § 102.67(a). The RD's decision is appealable to the Board. *Id.* § 102.67(b).

---

[2] Unless otherwise indicated, all citations to the Code of Federal Regulations refer to the version in effect at the time the described events took place.

When an election is held and it produces no objections, the RD issues "a certification of the results of the election, including certification of representative where appropriate." *Id.* § 102.69(b). If objections to the election are filed, the RD may dispose of them via an "administrative investigation" if they do not "raise substantial and material factual issues," *id.* § 102.69(d); *see also* Manual § 11395.1; otherwise a hearing is set before another HO to determine their merit. 29 C.F.R. § 102.69(d). [3] If a hearing is held, the presiding officer (whether HO or ALJ) issues a "report resolving questions of credibility and containing findings of fact and recommendations as to the disposition of the issues." *Id.* § 102.69(e). The parties may thereafter file "exceptions" to the report, *id.*, which exceptions the Board may ultimately review. *Id.* §§ 102.69(f), 102.67(c). Once this procedure runs its course, the Board may certify the union but a certification is generally not immediately judicially reviewable. *See, e.g.*, *Hartz Mountain Corp. v. Dotson*, 727 F.2d 1308, 1310–11 (D.C. Cir. 1984). To obtain judicial review of the certification, an employer can decline to bargain with the certified union, which declination then produces a ULP complaint. [4] *See* 29 U.S.C. §§ 158(a)(5), 160(f). The

_____

[3] If there is simultaneously pending an unfair labor practices (ULP) proceeding, the RD "may consolidate the [representation] hearing . . . before an administrative law judge" instead of an HO. 29 C.F.R. § 102.69(c)(1)(ii) (2015); *id.* § 102.33(a), (c) (2010).

[4] Although the Board's General Counsel (GC) exercises ultimate authority over the prosecution of a ULP complaint, *see* 29 U.S.C. § 153(d), the RD plays a substantial role in the process. For example, the ULP charge is generally filed with the RD of the region in which the alleged ULP has occurred or is occurring. 29 C.F.R. § 102.10. The RD then investigates to determine whether a complaint should issue. The investigation may be "as simple as ascertaining whether certain statements were made . . . . [o]r, the case may be as complex as ascertaining whether the parties' overall

Board's handling—and, at times, mishandling—of its layered procedure forms the heart of this case.

Salem is an acute-care facility located in Salem, New Jersey. On May 19, 2010, Health Professionals and Allied Employees AFT, AFL-CIO (HPAE or Union) filed an election petition with the Board to represent Salem's registered nurses. The proposed unit included charge nurses (CNs), who, Salem maintained, were supervisors and thus ineligible for representation under the Act. A representation hearing before an HO began on June 2, 2010, to create the record on which the RD was to determine the CNs' status and the appropriateness of the proposed bargaining unit.

While the representation hearing was underway, Salem filed a ULP charge against HPAE alleging supervisory taint resulting from the involvement of two alleged supervisory CNs in the filing of the petition. Upon receiving the charge, the RD began a second process to resolve the taint dispute: Salem was directed to provide the RD with evidence regarding the CNs' alleged involvement in the filing, while the record

_____

conduct over the course of protracted contract negotiations violated [the Act]." *See* Nat'l Labor Relations Bd. Casehandling Manual, Pt. 1, Unfair Labor Practice Proceedings § 10050 (2015). The charging party must, *inter alia*, meet with Board agents and comply with any reasonable request necessary to complete the investigation. *See id.* § 10054.1. If the charging party delays presentation of evidence without cause, the charge is "subject to dismissal for lack of cooperation." *Id.* If the charging party's evidence presents a "prima facie case," the *charged* party "should be contacted to provide additional and more complete evidence." *See id.* § 10054.4. The RD issues a complaint if "it appears . . . that formal proceedings in respect [of the charge] should be instituted" and sets a hearing before an administrative law judge (ALJ). 29 C.F.R. § 102.15. At this point, the GC prosecutes the complaint.

regarding the predicate CN supervisory status question was yet to be completed by the HO conducting the representation hearing.

Over a one-week period, June 2–9, 2010, witnesses for both Salem and the Union testified at the representation hearing. Two complications arose. First, Salem moved to transfer the proceeding to another regional office, alleging that the HO had engaged in *ex parte* communications with certain CN witnesses. The motion was denied, first by the HO and, ultimately, by the GC. Second, Salem requested that the HO prepare subpoenas for certain witnesses. Although the HO confirmed that the subpoenas would be prepared, *see* Representation Hr'g Tr. at 807 ("[Salem's Counsel] has requested some subpoenas. They are being prepared."), he closed the record on the following day over Salem's objection.

The RD's concurrent investigation of Salem's supervisory taint charge also proved troublesome. Salem missed multiple deadlines to produce witnesses for RD interviews. Moreover, the affidavit evidence it submitted to the RD was deemed insufficient. *See* Reg'l Dir.'s Letter of Dismissal 1 ("Even assuming that these charge nurses are supervisors within the meaning of . . . the Act, there is insufficient evidence to establish that the charge nurses' limited prounion activities coerced employees in the exercise of their Section 7 rights."). The RD then closed the investigation and declined to issue a complaint. Salem appealed the RD's decision to the GC but its appeal was denied. *See* Gen. Counsel's Denial of Hosp.'s Appeal of Reg'l Dir.'s Refusal to Issue Compl.

On August 2, 2010, using the HO's record from the representation hearing, the RD issued her decision regarding

the CNs' supervisory status. She concluded that all but two[5] of Salem's CNs were not supervisors and issued a "direction of election." The election took place on September 1–2, 2010. Salem challenged the RD's election order, arguing, *inter alia*, that the HO's record closure was premature, repeating its allegation of *ex parte* communications between the HO and CN witnesses and claiming that the alleged supervisors tainted the election petition. The Board denied the petition, concluding that Salem raised no issues warranting review. Thereafter, the election results were released and revealed that the Union won 73–48.

Salem next moved the RD to set aside the election results, raising 20 objections. Objections 1–16 tracked the events leading up to the election, that is, Salem's supervisory taint charge and the proceedings resulting in the determination that the CNs were not supervisors. Objections 18–20 involved allegations of impropriety that occurred during the election.[6] On January 10, 2011[7] the RD set a hearing before an HO to resolve the objections. The case was then consolidated with a pending ULP proceeding initiated by the Union and set to be heard by an ALJ on February 22.[8]

---

[5] The RD excluded the two nurses from the bargaining unit. *See* Reg'l Dir.'s Decision and Direction of Election at 23 n.12.

[6] On December 30, 2010, Salem abandoned Objection 17 by letter to the RD.

[7] All subsequent dates occurred in 2011 unless otherwise noted.

[8] The consolidation occurred because there was a pending ULP complaint against Salem based on charges the Union made. It withdrew the charges before the hearing began. *See* Union's Mot. for Special Permission to Appeal at 2 n.5; Salem Hosp. Corp., & Health Prof'ls & Allied Emps., JD-14-11, 2011 WL 1043489 (Mar.

On February 15, the Union filed a "request for special permission to appeal" (Special Appeal) with the Board, arguing that Salem's Objections 1–16 had already been decided and urging the Board to reverse the RD's decision setting a hearing thereon. Seven days later—before Salem responded and on the same day the ALJ began the representation hearing—the Board granted the Special Appeal and reversed the RD's decision. Salem filed its response to the Union's Special Appeal with the Board later that same day.

Although the Board overturned the RD's decision to set a hearing on Objections 1–16, it remanded the Objections to the RD for disposition. The RD administratively dismissed them on February 24. Before the ALJ reached the merits of the remaining Objections, Salem made two separate filings with the Board. First, Salem moved for reconsideration of the Board's grant of the Union's Special Appeal, arguing that its regulations did not allow for the procedure and that, assuming they did, Salem was, at a minimum, entitled to respond. Second, Salem appealed the RD's administrative dismissal of Objections 1–16. Before the Board ruled on either motion, the ALJ found against Salem on Objections 18–20 and

23, 2011). It is, however, unclear whether Board procedure was followed when the ALJ continued to hear the representation case. Board rules direct that an HO conduct a hearing on objections to an election. 29 C.F.R. § 102.69(d); *cf.* 29 C.F.R. § 102.69(c)(1)(ii) (2015) ("[E]xcept that the regional director may consolidate the hearing concerning objections and challenges with an unfair labor practice proceeding before an administrative law judge."). By the time the hearing set for February 22nd occurred, the ULP complaint had been withdrawn. The rules authorize the RD to sever a previously consolidated case, 29 C.F.R. § 102.33(a)(4), (c), and, presumably, assign the representation hearing to an HO and the ULP proceeding to an ALJ. Here the RD instead allowed the remaining representation hearing to proceed before the ALJ.

explained that he did not resolve Objections 1–16.  *See* Salem Hosp. Corp., & Health Prof'ls & Allied Emps., JD-14-11, 2011 WL 1043489 (Mar. 23, 2011) ("I have not treated with or considered in any respects [Salem's] Objections 1–16.").

On April 6, Salem filed seven exceptions to the ALJ's decision, arguing that he erred in declining to rule on Objections 1–16 and that his findings on Objections 18–20 were wrong on the merits.  On August 3, the Board[9] denied the exceptions and certified HPAE as the exclusive collective bargaining representative for Salem's registered nurses (including CNs).  The Board also denied Salem's reconsideration motion regarding the Union's Special Appeal. The Board, however, neglected to dispose of Salem's appeal of the RD's administrative dismissal of Objections 1–16.

Salem then refused to recognize or bargain with HPAE and, on September 14, the GC filed a ULP complaint alleging

---

[9] Although it is unclear from the record, Salem claims that it "filed with *the Board* timely Exceptions to [the ALJ's] decision," Pet'r Br. at 14 (emphasis added); Employer's Br. in Sup. of its Exceptions to the Rec. Dec. of Administrative Law Judge Earl E. Shamwell, Jr., at 1, and indeed, the Board ruled on them. Parenthetically, the rules now direct that exceptions to a post-election representation hearing order must be filed with, and ruled on by, the RD.  29 C.F.R. § 102.69(c)(iii) (2015) ("Any party may, within 14 days of the issuance of such report, file with the regional director . . . exceptions to such report . . . . . The regional director shall thereupon decide the matter upon the record or make other disposition of the case.").  An appeal may *then* be taken to the Board.  *Id.* § 102.69(c)(2) ("The decision of the regional director . . . shall be final unless a request for review is granted [by the Board].").  Granted, exceptions to an ALJ's ULP ruling are filed directly with the Board, *id.*; 29 C.F.R. § 102.46 (2015), but the Union had dropped its ULP complaint, *see supra* n.8.

that "[o]n or about August 17, Respondent, by letter of [CEO], notified the Union that it refused to recognize and bargain with the Union as the exclusive collective bargaining representative of the Unit." Complaint and Notice of Hearing, Case 04-CA-064455 at 2. Salem conceded its refusal but raised as "affirmative defenses" many of the alleged improprieties that plagued the earlier proceedings—specifically, that: (1) the Board should have sustained Salem's objections to the election; (2) the Board should not have granted the Union's Special Appeal; (3) the GC should have transferred the representation hearing to another HO; (4) the GC should have issued a complaint in connection with Salem's supervisory taint charge; and (5) the Board impermissibly failed to rule on Salem's appeal of the RD's dismissal of Objections 1–16.

An ALJ hearing was scheduled for December 14, but, on October 12, the GC moved for summary judgment before the Board. *See* 29 C.F.R. § 102.24(a) (summary judgment motion is to be filed with Board). Before ruling on the motion, the Board issued an "erratum" amending its August 3rd certification order. The one-page order acknowledged the Board's failure to resolve Salem's appeal of the RD's dismissal of Salem's Objections 1–16 and purported to deny it *nunc pro tunc*. Finally, on November 29 the Board granted the GC's motion for summary judgment on the ULP complaint, concluding that all of Salem's defenses either were—or could have been—litigated in the earlier proceedings. *Salem Hosp. Corp.*, 357 NLRB No. 119, 2011 WL 5976073 at *1 & n.5 (2011) (citing *Pittsburgh Plate Glass Co. v. NLRB*, 313 U.S. 146, 162 (1941)).

Salem timely petitioned for review of the Board's November 29 order and the Board cross-applied for enforcement. Our jurisdiction is based on 29 U.S.C. § 160(e), (f).

## II. ANALYSIS

Salem's several challenges focus, at bottom, on the Board's faulty adherence to its procedure.[10] Our review is for abuse of discretion, *see Canadian Am. Oil Co. v. NLRB*, 82 F.3d 469, 473–76 (D.C. Cir. 1996) (reviewing challenged procedural steps), and Salem must show that "prejudice resulted from" the Board's lapses. *Desert Hosp. v. NLRB*, 91 F.3d 187, 190 (D.C. Cir. 1996). This it fails to do. Our analysis is informed by the significant deference we accord the Board's determination of an appropriate bargaining unit, reversing only if the certification is "arbitrary and without substantial evidence." *Cleveland Constr., Inc. v. NLRB*, 44 F.3d 1010, 1014 (D.C. Cir. 1995).

### A. CLOSING REPRESENTATION HEARING RECORD

First, Salem challenges the HO's closure of the record before Salem could present evidence supporting its claim regarding the CNs' supervisory taint. The NLRA is largely silent on the gathering and presentation of evidence at a representation hearing but the Board has provided substantial guidance by regulation. For example, it is the HO's duty to "inquire fully into all matters and issues necessary to obtain a full and complete record." 29 C.F.R. § 102.64(a). The hearing itself is "investigatory, intended to make a full record

---

[10] Under recent Board precedent, Salem also challenges the validity of the regulation—29 C.F.R. § 103.30(a)—pursuant to which the Union was certified. Because Salem did not press its argument in the proceedings before the Board, however, it is forfeited. *See* 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board . . . . shall be considered by the court."). Moreover, we reviewed the challenged regulation in *San Miguel Hosp. Corp. v. NLRB*, 697 F.3d 1181 (D.C. Cir. 2012), and upheld it against an identical challenge.

and nonadversarial." *See* Manual § 11181. Before the hearing closes, the HO is to ask "on the record, whether [the parties] have anything further to add." *See id.* § 11240. And he "*shall*, on the written application of any party, forthwith issue subpoenas requiring the attendance and testimony of witnesses." 29 C.F.R. § 102.66(c) (emphasis added); *see also id.* ("The Regional Director or the hearing officer . . . shall forthwith grant the subpoenas requested.").[11]

The HO's premature closing of the record was without explanation. One day after announcing that Salem's requested subpoenas would issue, he closed the record over Salem's objection. Granted, the HO apparently agreed with the Union that Salem's requested witnesses were cumulative[12]

---

[11] The NLRA contains a similar provision. *See* 29 U.S.C. § 161(1) (Board "shall upon application of any party to such proceedings, forthwith issue to such party subp[o]enas requiring the attendance and testimony of witnesses"). The Board may revoke a subpoena only if "in its opinion the evidence whose production is required does not relate to any matter under investigation, or any matter in question in such proceedings, or if in its opinion such subp[o]ena does not describe with sufficient particularity the evidence whose production is required." *Id.* In *Drukker Communications v. NLRB*, 700 F.2d 727 (D.C. Cir. 1983), we recognized two grounds ("unwarranted interference with First Amendment rights," *id.* at 730, and whether production would "harm the public interest," *id.* at 731) for revoking a subpoena but concluded that, in the absence of an express or implied ground, revocation amounts to agency action "without observance of procedure required by law." *Id.* at 734; *see also* 5 U.S.C. § 706(2)(D). Salem does not argue that closing the record also violated the statute.

[12] The Union argued that "[t]his testimony is cumulative or repetitive . . . we would just object and ask that the testimony be limited." Representation Hr'g Tr. at 915. The HO

but that inference is hardly ineluctable. According to the record, the HO stated only that "the Employer and the Petitioner have had an opportunity to discuss the supervisory status of the charge nurses" and that he was "not going to take additional testimony." Representation Hr'g Tr. at 916. In her decision on the CNs' supervisory status, the RD also failed to explain the HO's failure to issue the subpoenas.

Notwithstanding this misstep, the record does not indicate that Salem sought to introduce relevant, non-cumulative evidence and, without that, we cannot find that Salem was prejudiced. *See Reno Hilton Resorts v. NLRB*, 196 F.3d 1275, 1285 n.10 (D.C. Cir. 1999) (no abuse of discretion where excluded evidence would not "compel or persuade to a contrary result" (quoting *Cooley v. FERC*, 843 F.2d 1464, 1473 (D.C. Cir. 1988))); *cf. Ozark Auto. Distribs., Inc. v. NLRB*, 779 F.3d 576, 580–81 (D.C. Cir. 2015) (vacating decision to exclude evidence that was non-cumulative and critical to employer's defense). At the hearing, Salem simply asserted that it had "additional witnesses who will be probative of the . . . supervisory status of charge nurses" and that it intended to go "through the *same kind of questioning* of those witnesses as [it] did with [its previous] witnesses and as the Union ha[d] done with their witnesses. It would concern the testimony of [the] Union's witnesses and embellishment of that position and testimony." Representation Hr'g Tr. at 914 (emphasis added).[13]

---

contemporaneously "rule[d] that [he would] not allow any additional testimony." *Id.*

[13] In its brief, Salem claims that the "Union voiced no objection to the Hospital's desire to offer further evidence." Pet'r Br. at 25–26. But, as we noted, *see supra* n.12, that is not true. In addition, although the record is unclear, we note that Salem's

15

In any event, the Board's determination of the CNs' non-supervisory status is supported by substantial evidence. The RD made detailed findings[14] based on the representation hearing record and her reasoning sufficed to support her determination regarding the CNs' non-supervisory status. *See* Reg'l Dir.'s Decision and Direction of Election. Further, the Board finds against supervisory status if there is conflicting evidence in the record, *see Phelps Cmty. Med. Ctr.*, 295 NLRB 486, 490 (1989) ("[W]henever the evidence is in conflict or otherwise inconclusive on particular indicia of supervisory

_____

counsel apparently requested the subpoenas as a delaying tactic to prevent the HO's closing the record. After the HO predicted that the hearing would conclude within one day, Salem's counsel asserted: "Not if I have anything to do with it. Request for subpoenas, the issuance of subpoenas." Representation Hr'g Tr. at 805. If this is so, it is indeed regrettable. We have previously noted the sharp practice of Salem's counsel in proceedings before us and do so again here in an effort to stop its repetition. *See San Miguel Hosp. Corp.*, 697 F.3d at 1188 ("As we noted at the outset, the Hospital unleashed a blizzard of arguments to challenge the Board's unfair-labor-practice orders. It might be appropriate to suggest that in appellate argument, the proverbial rifle is preferable to a machine gun—but that would assume petitioner had at least a few good arguments; it did not. In truth, it appears to us that all the Hospital sought was the inevitable delay that review of Board orders affords.").

[14] *See* Reg'l Dir.'s Decision and Direction of Election at 17 (finding Salem CNs assign nurses to patients but process "does not involve independent judgment" and nurses "generally meet and decide among themselves which nurse should care for which patient"); *id.* at 19 (finding Salem CNs direct aides to perform some rudimentary tasks but "any nurse, not only a CN, may request that aides perform such functions" and "assignment of [these] basic tasks [does not] require[] independent judgment."); *id.* at 20 (only disciplinary authority CNs have is to issue "written warning").

authority, we will find that supervisory status has not been established."), and that is what it did here. *See* Reg'l Dir.'s Decision and Direction of Election at 17 n.11 ("At best, [Salem] can argue that the evidence is in conflict as to whether the CNs [exercise supervisory authority]. The Board will not find supervisory status in the face of such a conflict."). Nonetheless, Salem contends that the excluded testimony would have resolved conflicting evidence tending to show non-supervisory status.[15] We do not see how, by introducing *more* conflicting testimony, Salem could have solved the evidentiary conflict.

Salem relies on our *Ozark* decision to argue that parties have a *right* to present all relevant evidence during a representation hearing. But *Ozark* involved substantially different facts. There, the employer challenged the Board's certification because four of its employees allegedly "acted as agents of the union." *Ozark*, 779 F.3d at 580. In a post-election objection hearing, the employer served subpoenas *duces tecum* on the union and on an employee who, according to the employer, had acted as a union agent. *Id.* at 578. Both the union and the employee objected to the subpoenas on the grounds of overbreadth and privilege. *Id.* After reserving her ruling on the subpoenas, the HO eventually granted the union's and the employee's motions to revoke the subpoenas without examining the documents the employer sought. *Id.* at 578–79. We found that the HO's revocation action violated Board procedure. *Id.* at 581–82. The Board's Guide for Hearing Officers in Representation Proceedings "state[d] that when confidentiality or other objections are raised to oppose a subpoena . . . the hearing officer should

---

[15] *See* Pet'r. Br. at 25 (arguing its witnesses would testify that, based on their everyday working relationship with CNs, patient assignment was "hardly 'collaborative' ").

consider receiving the material *in camera* and reviewing the documents to determine whether redacting certain information or narrowing the scope of the subpoena might cure the objection." *Id.* at 582. We concluded that the procedural flaw prejudiced the employer because establishing that employees acted as union agents was critical to the employer's defense; in addition, the HO's delay in ruling on the subpoenas increased the prejudice to the employer because, had the employer known earlier that the subpoenas would be quashed, it could have "alter[ed] its presentation . . . . All trial lawyers know the danger of the unknown." *Id.*

We are not persuaded by Salem's attempt to align its case with *Ozark*. In *Ozark* we found prejudice based on both the relevant and non-cumulative nature of the evidence sought to be presented and the delay in ruling, which exposed the employer to uncertainty in establishing its defense. *Id.* at 582–83. By contrast, because Salem failed either to make a proffer or to provide any other specific evidence of potential witnesses' testimony,[16] we cannot determine that the excluded evidence was either relevant or material.

---

[16] At oral argument Salem's counsel contended that its proffer was made orally, *see* Oral Arg. Recording at 3:30 ("Counsel for the hospital explicitly references the house supervisors and the need, in light of the evidence elicited by the Union . . . to put on the house supervisors to explain their duties and also to explain the illogical position being taken during testimony by the charge nurses."); *see also* Representation Hr'g Tr. at 914–15 ("[I]t would be the house supervisors" and "it would concern the testimony of [the] Union's witnesses and embellishment of that position and testimony."). To the extent we can consider the foregoing a proffer, it hardly tells us what the witnesses would testify to, much less how their testimony could "persuade to a contrary result," *Reno Hilton Resorts*, 196 F.3d at 1285 n.10, given the Board's practice of finding

In sum, despite the Board's unexplained failure to allow a party to submit evidence at a representation hearing, Salem has not, as it must, established prejudice. Accordingly, we conclude that the HO's premature closing of the record was not an abuse of discretion.

## B.   FAILURE TO TRANSFER FOR ALLEGED *EX PARTE* COMMUNICATIONS

Salem next challenges the GC's failure, on review from the HO's similar failure, to transfer the representation hearing to another region in light of the alleged *ex parte* communications. The Board's regulations prohibit *ex parte* communications. 29 C.F.R. § 102.126(b) ("No Board agent . . . participating in [relevant proceedings], shall . . . make or knowingly cause to be made any prohibited ex parte communications about the proceeding to any interested person outside this agency relevant to the merits of the proceeding."). Board regulations also grant the GC power to transfer the case "in order to effectuate the purposes of the [NLRA]." *Id.* § 102.33(a).

The GC's failure to transfer was reasonable under the circumstances. Salem did not make specific allegations of *ex parte* communications, *see* Gen. Counsel's Denial of Hosp.'s Mot. to Transfer at 2 (July 27, 2010) ("Initially, outside of unsubstantiated claims, your communication references no evidence of such *ex parte* meetings."), and the GC's own investigation found that "neither the Hearing Officer nor his supervisor engaged in any." *Id.* In fact, the "Hearing Officer's contact with the Employer's nurses, except for an

---

against supervisory status if there is conflicting evidence. *See Phelps Cmty. Med. Ctr.*, 295 NLRB at 490.

19

occasional pleasantry, was limited to those times when they were testifying on the record." *Id.*

Salem faults the GC for failing to *request* its evidence of *ex parte* communications but cites no regulation or policy that requires the GC to affirmatively seek evidence. Moreover, Salem had the opportunity to present its evidence, both in its petition for transfer before the GC and in its earlier motion before the HO. But the petition contained only conclusory assertions, *see* Salem's Mot. to Transfer at 1 n.1 ("It was apparent during the hearing (specifically on June 4, 2010) that . . . [the HO] had met privately with the Union's two attorneys and at least [one CN] . . . regarding various issues related to the petition."), and the same was true at the hearing. *See* Representation Hr'g Tr. at 618 ("I would imagine that there are Board agents . . . who are bound by certain ethical consideration, in terms of meeting with a supervisor of this Employer in my absence. And I just want the Regional Office to understand, if that is something which is in play here . . . I would recommend that serious thought be given to whether or not to modify that behavior.").

In any event, Salem does not claim that it was prejudiced by the decision not to transfer. Indeed, "ex parte communications, even when undisclosed during agency proceedings, do not necessarily void an agency decision." *Prof'l Air Traffic Controllers Org. v. FLRA*, 685 F.2d 547, 564 (D.C. Cir. 1982). Rather, a party must show that "as a result of improper ex parte communications, the agency's decisionmaking process was irrevocably tainted." *Id.* Because Salem has not shown prejudice, we conclude that neither the HO nor the GC abused his discretion.[17]

---

[17] In its brief Salem argued that the alleged *ex parte* communications meant that the HO had prejudged the CNs' status.

## C.  UNION'S SPECIAL APPEAL

Salem makes two arguments regarding the Union's Special Appeal of the RD's decision to set a hearing on Salem's Objections 1–16.  First, Salem asserts that no Board rule permits such an appeal.  Second, it objects to the Board's failure, in any event, to allow Salem to respond.  The Board's errors are not insignificant but, again, prejudice to Salem is lacking.

The Special Appeal was undoubtedly unauthorized.  The Union relied on 29 C.F.R. § 102.26 to press its Special Appeal but that rule governs appeals in *unfair labor practices proceedings*.  The Board asserts that another rule—29 C.F.R. § 102.65(c)—permits the appeal.  Even if the Board is correct, it misapplied the rule here.

At the time the Union made its Special Appeal, Section 102.65(c) provided that

> Requests to the regional director, *or to the Board in appropriate cases*, for special permission to appeal from a ruling of the hearing officer, together with the appeal from such ruling, shall be filed promptly, in writing,

---

Its argument does not support a prejudice finding given that the RD—not the HO—makes the status determination.  *See* 29 C.F.R. § 102.67 (directing that RD, not HO, render a decision).  Salem also argued that, in order to protect the HO, the RD had an improper incentive to find no supervisory status.  We reject this conclusory assertion.  *Cf. Withrow v. Larkin*, 421 U.S. 35, 55 (1975) ("Without a showing to the contrary, [government actors] are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances.") (internal quotations omitted).

and shall briefly state (1) the reasons special permission should be granted and (2) the grounds relied on for the appeal. . . . Any statement in opposition or other response to the request and/or to the appeal shall be filed promptly.

(emphasis added). [18]  Section 102.65(c) gave the Board considerable discretion in its implementation, *viz.*, special appeals to the Board were permitted "in appropriate cases." 29 C.F.R. § 102.65(c).  But the Board could not explain at oral argument why this was an "appropriate case," *see* Oral Arg. Recording at 23:34–25:15 ("I do not think it is unprecedented . . . . I could try to find out for you."). [19] Moreover, the Board's interpretation of "filed promptly" here is inconsistent at best.  The Board heard the Union's Special Appeal even though it was filed more than one month after the RD decision setting a hearing.  *If* the Union's filing was prompt, then Salem's response within one week was alacritous.  Yet the Board gave one party over one month to

---

[18] The highlighted language has since been deleted. Section 102.65(c) now provides:  "Requests to the regional director for special permission to appeal from a ruling of the hearing officer, together with the appeal from such ruling, shall be filed promptly, in writing, and shall briefly state the reasons special permission should be granted and the grounds relied on for the appeal. . . . Any statement in opposition or other response to the request and/or to the appeal shall be filed promptly, in writing, and shall be served immediately on the other parties and on the regional director."

[19] If *not* unprecedented, the Board has apparently expanded the scope of section 102.65(c) by allowing special appeals from an RD decision although special appeals were (and are) limited to "a ruling of the hearing officer."  29 C.F.R. § 102.65(c); *see also* 29 C.F.R. § 102.65(c) (2015).

file without allowing the other side so much as a week to respond.

Nonetheless, Salem once again cannot establish that the Board's mistake prejudiced it. Salem asserts that, by granting the Union's Special Appeal and reversing the RD's decision setting a hearing, it was stripped of its ability to argue the merits of Objections 1–16 to the ALJ. Although true, Salem was not prejudiced thereby for at least three reasons. First, Objections 1–16 related to the CNs' supervisory status, an issue that had already been litigated before the Board. Even if Salem were allowed to make its arguments to the ALJ, we see no reason that the ALJ would have reached a conclusion contrary to that of the Board. Second, if Salem were for some reason successful before the ALJ, the Board reviews his decisions and the Board had already determined that Salem's objections constituted prohibited relitigation.[20] Finally, if the procedural error did prejudice Salem, the prejudice was cured when the Board considered Salem's motion for reconsideration. Before certifying the Union, the Board reconsidered its earlier order—this time with the benefit of Salem's response—and reached the same conclusion.

### D. BOARD'S "ERRATUM" ORDER

Salem next questions the propriety of the Board's Erratum, which redressed the latter's failure to timely rule on

---

[20] *See* 29 C.F.R. § 102.69(d) (directing that hearing be held only if there are "substantial and material factual issues"). The Union argued that Objections 1–16 did not meet this requirement because they were already "decided by the RD in the [decision and direction of election], concerning which review was denied by the Board," Union's Mot. for Special Permission to Appeal at 2, and the Board agreed. *See* NLRB Order Granting Mot. for Special Permission to Appeal at 2.

Salem's appeal of the RD's administrative dismissal of Objections 1–16. But the Board had *already* determined that Salem's Objections 1–16 were meritless. It did so both when it denied Salem's petition for review of the RD's direction of election *and* when it granted the Union's Special Appeal. Salem does not explain how the Board's issuance of the erratum was *ultra vires* or how the order prejudiced it.

### E.  BOARD'S DENIAL OF SALEM'S DEFENSE TO ULP CHARGE

Salem's final salvo is that the Board prevented it from litigating supervisory taint as a defense to the ULP charge. We do not see how Salem could establish taint without relitigating the predicate supervisory question but it nonetheless maintains that the Board should have permitted it to make the argument as a defense in the ULP proceeding.

Board regulations generally prohibit—in ULP proceedings—relitigation of matters that arose at the earlier representation proceeding stage. *See* 29 C.F.R. § 102.67(f) ("[This rule] shall preclude . . . parties from relitigating, in any related subsequent unfair labor practice proceeding, any issue which *was*, *or could have been*, raised in the representation proceeding." (emphasis added)). We have upheld the rule, *see Pace Univ. v. NLRB*, 514 F.3d 19, 23–24 (D.C. Cir. 2008), and only limited exceptions apply. For example, relitigation is allowed if newly discovered evidence requires reexamination of the representation decision. *See Joseph T. Ryerson & Sons, Inc. v. NLRB*, 216 F.3d 1146, 1151 (D.C. Cir. 2000) ("It is well established that in the absence of newly discovered evidence or other special circumstances requiring reexamination of the decision in the representation proceeding, a respondent is not entitled to relitigate in a subsequent refusal-to-bargain proceeding representation issues that were

or could have been litigated in the prior representation proceeding." (quotation omitted)).    Relitigation is also permitted if subsequent legal authority changes the relevant law.    *See Alois Box Co. v. NLRB*, 216 F.3d 69, 78 (D.C. Cir 2000) ("Because . . . the company failed to present legal authority indicating that the Board had changed its standard for determining supervisory status" the application of its "rule against relitigation" was proper).    Again, we review application of the Board's no-relitigation rule for abuse of discretion.    *See Pace Univ.*, 514 F.3d at 24.

The relitigation ban plainly applied to Salem.    Salem had already raised the CNs' supervisory status issue in the representation proceeding and lost.    It was also unsuccessful in pursuing its supervisory taint charge.    Salem nonetheless makes three arguments in favor of relitigation.    First, Salem recycles the argument about its inability to present supervisory status evidence at the representation hearing.    We resolved this issue at the representation hearing level, *see supra* part II.A, and Salem offers no reason for us to reconsider it at the ULP stage.    Next, Salem contends that parties in ULP proceedings are guaranteed the right to raise affirmative defenses, notwithstanding the GC considered the facts supporting the defense in the context of a potential charge and declined to issue a complaint.    Although Salem is correct, *see United Food and Commercial Workers v. NLRB*, 675 F.2d 346, 354–55 (D.C. Cir. 1982) (because "[a] party subject to an unfair labor practice complaint has a right to a hearing" and "the scope of the General Counsel's investigatory inquiry does not approach that of the required hearing," GC's consideration and denial of charge cannot prevent party from litigating facts of charge as defense in ULP proceeding), the argument gets it only half-way to the finish line.    It removes one obstacle—the GC's decision not to pursue a supervisory taint complaint—but leaves another undisturbed—the fact that Salem already

litigated—and lost—a question of fact essential to the defense, namely, the CNs' non-supervisory status.

Finally, Salem contends that Board precedent permits relitigation here, relying on *Sub-Zero Freezer Co.*, 271 NLRB 47 (1984) (allowing employer to relitigate pre-election issues at ULP proceeding).   But, as the Board describes it, *Sub-Zero* is a limited exception.   *Salem Hosp. Corp.*, 357 NLRB No. 119, 2011 WL 5976073 at \*1 n.5 ("*Sub-Zero* is one of a limited number of cases in which the Board has departed from the [no-relitigation] rule.").   There, the Board credited allegations that union supporters had threatened the property and lives of voting employees.[21]   The election was also close—the union won by only two votes.   *Sub-Zero*, 271 NLRB at 47.   The Board in *Sub-Zero* acknowledged its departure from the general no-relitigation policy but explained that failure to make an exception there would result in an order "requiring an employer to bargain with a union that has not attained the status of majority representative from a free and fair election." *Id*.

Assuming *arguendo* that the Board erred by not allowing Salem to use the *Sub-Zero* exception, we believe no prejudice resulted therefrom.   As we have explained, substantial evidence supports the Board's conclusion that the CNs were not supervisors.   In addition, Salem had failed to persuade the RD that the CNs engaged in any conduct resulting in supervisory taint even if they were in fact supervisors.   We therefore conclude that the Board did not abuse its discretion in prohibiting Salem from relitigating supervisory taint.

---

[21] In *Sub-Zero*, the Board incorporated by reference the facts set forth in an earlier Board decision.   *Sub-Zero*, 271 NLRB at 47 (citing 265 NLRB 1521, 1522–23 (1982)).

26

\* \* \*

The Board's myriad missteps—its own as well as those of its agents—are a cause for concern and we can only hope that this case constitutes an exception to an otherwise robust and faithful adherence to the Board's own process. *See, e.g.*, *Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("[I]t is incumbent upon agencies to follow their own procedures.").

For the foregoing reasons, we deny Salem's petition for review and grant the Board's cross-application for enforcement.

*So ordered.*